GULF & SHIP ISLAND RAILROAD COMPANY *v.* WIRT ADAMS,
STATE REVENUE AGENT (TWO CASES)

AND

YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.*
WIRT ADAMS, STATE REVENUE AGENT
(TWO CASES).

[45 South., 91.]

1. CONSTITUTIONAL LAW. *Obligation of contract. Railroad charter.
Constitution of U. S., article 1, sec. 10. Constitution 1890, sec. 16.*

Where. chartering. a railroad corporation by direct legislative act
the state granted it the right to fix, within maximum and mini-
mum limits, the rates to be charged by it for ·carrying persons
and property, the grant is inviolate, under Constitution of the
United States, article 1, sec. 10, prohibition the impairment of
the obligation of contracts.

2. SAME. *Laws* 1898, *p.* 66. *United States Constitution XIV Amend-
ment. Constitution* 1890, sec. 112. *Due process of law. Cor-
porate franchises. Taxation. Double taxation.*

Laws 1898, p. 23, sec. 66, purporting to impose. on each railroad
company claiming an exemption from state supervision, under
maximum and minimum provisions of its charter as to rates, an
additional privilege tax is unconstitutional and void:—

(*a*) Its enforcement would be a taking of property without due process
of law, contrary to the fourteenth amendment to the constitution
of the United States, since the tax is one over and beyond the
usual tax required to be paid by other railroads doing similar
business and the exaction is solely because of the enjoyment by
the railroad company of its contract right;

(*b*) It violates article 1, sec. 10, United States Constitution, prohibit-
ing a state to pass any law impairing the obligation of contracts,
and Constitution 1890, sec. 16, providing that' laws impairing
the obligation of contracts shall not be passed, since it impairs

the charter contract and the tax is imposed solely because of the enjoyment by the railroad company of its contract right;

(c) Considered as an *ad valorem* tax it is discriminatory and violative of Constitution 1890, sec. 112, providing that taxation shall be equal and uniform, since it provides for a classification of railroads and the imposition of a privilege tax according thereto and lays the additional tax solely with reference to the existence of the exemption, irrespective of value; and

(d) Considered as an *ad valorem* tax on the value of the exemption as property the additional privilege tax is violative of Constitution 1890, sec. 112, providing that taxation shall be equal and uniform, since the revenue laws provide that there shall be an assessment of railroad property for *ad valorem* taxes by the railroad commission, values to be fixed with reference to the earning capacity of the companies and their franchises, and it must be presumed that the commission has considered the exemption as an element of property value.

From the circuit court of, first district, Hinds county.

Hon. David M. Miller, Judge.

Adams, State Revenue Agent, the appellee, was plaintiff in all the suits; the Gulf & Ship Island Railroad Company, appellant, was defendant in two of them and the Yazoo & Mississippi Valley Railroad Company, appellant, was defendant in the other two. The defendants, appellants, demurred to the respective declarations against them and the court below overruled the demurrers in each case. The defendants did not ask to plead further and final judgment in each case was rendered in plaintiff's favor and the defendants each appealed to the supreme court in the cases against them respectively.

The suits were efforts by the State Revenue Agent to recover of the defendants, railroad companies, the additional privilege taxes of $10 per mile for several years—the two suits against each defendant were for taxes of different years—assessed by the Railroad Commission against them under sec. 66, p. 23, Laws 1898, as being railroads "claiming exemption from state supervision under maximum and minimum provisions of their charters."

The act of the legislature in question is as follows:

"Section 1. *Be it enacted by the legislature of the state of Mississippi:* That a privilege tax is levied as follows on the following industries carried on in this state. . . .

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Section 66. Railroads.—Railroads are divided into four classes, first, second, third and narrow gauge, and privilege taxes are levied on them as follows:

On each railroad of first class, per mile............$20 00
On second class per mile........................ 15 00
On third class per mile......................... 10 00
On narrow gauge per mile....................... 2 00
On each railroad claiming exemption from state supervision under maximum and minimum provisions in
    their charter, an additional privilege tax, per mile of 10 00

" The Railroad Commission shall annually, on or before the first Monday of August, classify the several railroads according to such charter exemption claims and the gross earnings of each, and the privilege taxes thereon shall be paid on or before the first day of December, and the findings of the railroad commission shall be certified to the auditor of public accounts, and the chancery clerks of the counties through which each road runs."

Section 19 of the Gulf & Ship Island charter, under which exemption from state supervision was claimed, is as follows:—

"Section 19. Be it further enacted, that said company shall have and possess the power of fixing, from time to time, by its board of directors, the rates at which it will do express or telegraph business, and also the rates at which said company will transport persons or property over its railroads and branches; provided said last mentioned rates shall not exceed four cents per mile for each passenger, nor exceed the following rates on freights: sixty-five cents per hundred pounds for

transporting first, or second class freights one hundred miles or less; forty-five cents per hundred pounds for transporting third or fourth class freight one hundred miles or less; thirty-two cents per hundred pounds for transporting fifth or sixth class freights one hundred miles or less (reference being had herein to the classification of freights now recognized and observed on the existing line between New Orleans and Jackson, Mississippi); but in no case shall the railroad company be limited to a less charge than twenty-five cents, for the transportation of any passenger, or parcel, or package or article, however short the distance. The rates so established from time to time by said board of directors, for transporting persons or property as a railroad company, not exceeding the maximum rates for said railroad business as above set out, may be charged and collected by said company."

Section 6 of the Yazoo & Mississippi Valley charter, under which exemption from state supervision was claimed, is as follows:—

"Section 6. Be it further enacted that said company shall have and possess the power of fixing, from time to time, by its board of directors, the rate at which it will do express and telegraph business, and shall transport other express companies as may apply for transportation over its line, at a just and reasonable rate of compensation, and also the rate at which said company will transfer persons or property over its railroad and branches, provided said last-mentioned rates shall not exceed four cents per mile for each passenger, nor exceed the following rates of freight: Sixty-five cents per hundred pounds for transporting first or second class freight, one hundred miles or less; forty-five cents per hundred pounds for transporting third and fourth class freights one hundred miles or less; thirty-two cents per hundred pounds for transporting fifth or sixth class freight one hundred miles or less (reference being had herein to the classification of freights now recognized and observed on the existing railroad line

between New Orleans, La., and Jackson, Miss). But in no case shall the railroad be limited to a less charge than twenty-five cents for the transportation of any passenger, parcel, package, or article, however short the distance. The rates so established from time to time by the board of directors for transporting persons or property as a railroad company, not .to exceed the maximum rates for railroad business as above set out, may be charged and collected by said company. . . . Provided, further, that as to lumber, coal, iron, salt, machinery, fertilizer, bricks, lime, agricultural implements, steam engines, and boilers, and other freights transported in car load lots, rates may be made by special agreement between the shippers and the company for such sum as they may agree upon; but in all such cases the same rates shall be given to any shipper of an equal quantity at the same time, under similar circumstances, of similar freight between the same points. Nothing herein contained shall prevent the railroad company from making such reduction of rates below the minimum herein fixed as it may elect to do for the purpose of fostering, aiding and developing resources of the country penetrated by its railroad branches."

Suits between the same parties involving the validity of the statute, Laws 1898, p. 23, sec. 66, were heretofore decided by this court. *Railroad Co.* v. *Adams,* 83 Miss., 306, 36 South., 144, *Railroad Co.* v. *Adams,* 85 Miss., 772, 38 South,. 348. The cases first cited (83 Miss., 36 South.) were suits for the additional privilege taxes for the years 1898, 1899, 1900, 1901 and 1902, and, while involving the constitutional question now decided, they were resolved in favor of the railroad companies because of a failure on the part of the state railroad commission to classify them under the statute as being liable for the additional tax; the constitutional question was reserved because unnecessary to the decision of those cases. The second appearance of the suits between the same parties (85 Miss., 38 South.) involving the

same statute arose from an effort of the state revenue agent to have the state railroad commission back classify the appellants so that the back classification could be made the basis for collecting the additional tax which had been adjudged uncollectible for want of such a classification. These cases also involved the constitutional question decided in the present cases, but it was again pretermitted, the court holding that there was no power in the railroad commission to back classify under the statute. The present suits were respectively for the taxes of 1903 and 1904, for which years the state railroad commission had formally classified the appellants as being liable for the additional $10 per mile privilege tax."

*McWillie & Thompson,* and *J. H. Neville,* for appellant, the Gulf & Ship Island Railroad Company.

The charter of appellant company, of which this court takes judicial notice, *Mississippi Railroad Commission* v. *Gulf & Ship Island Railroad Co.,* 78 Miss., 750, is found, Laws of Mississippi 1882, pp. 849–862.

Is section 66, Laws 1898, p. 23, constitutional?

The section violates both the state and national constitutions, in this: that it impairs the obligations of contracts between the state and appellant, evidenced by the nineteenth section of appellant's charter.

Equality and uniformity, as far as the same can be obtained, are required in the imposition of privilege as well as *ad valorem* taxes. This was decided by this court in the case of *Adams, State Revenue Agent* v. *Mississippi Lumber Co.,* 84 Miss., 23 s.c., 36 South. Rep., 68. We have not failed to observe the case of *Clarksdale Insurance Agency* v. *Cole,* 87 Miss., 637, wherein the court seems to have ignored the *Mississippi Lumber Co. case* (84 Miss., 23). We trust the two cases can be reconciled, but whether they can be or not, we think the earlier decision the correct one. The court,

however, is respectfully referred to what Judge Cooley says on the subject, Cooley on Taxation (2d ed.) p. 169–170.

"But are there not cases which on their faces are manifestly so unequal and unjust as to furnish conclusive evidence that equality has not been sought for, but avoided; that oppression, not justice, was desired, and confiscation, not taxation, intended? Such cases it is surely possible to conceive, and if such has never been the intent of the legislation, it is certain that it has sometimes been the result.

"A license tax might not be unjust though laid upon a single occupation, provided that it was so laid that none who followed that occupation escaped it. Let it reach all of the class, either of persons, or things, it matters not whether those included in it be one or many, or whether they reside in any particular locality or are scattered all over the state. But when, for any reason, it becomes discriminative between individuals of the class taxed, and selects some for an exceptional burden, the tax is deprived of the necessary element of legal equality, and becomes inadmissible. It is immaterial on what ground the selection is made; whether it be of residence in a particular portion of the taxing district, or because the persons selected have been remiss in meeting a former tax for the same purpose, or because of any other reason, plausible or otherwise; for if the principle of selection be once admitted, limits cannot be set to it, and it may be made use of for the purpose of oppression, or even of punishment."

This proceeding is a demand on the part of the state for an additional tax as a condition to the exercise of a right granted in a charter. It is not a tax on a business or calling, or occupation, for that is already taxed and the tax has been paid. It is an additional charge laid on a particular clause in a charter. It is a demand made on this appellant, a third class railroad, different from that made on *other third class railroads,* and the demand is sought to be justified on the idea that appellant possesses a right which the state may separately

and additional tax. In other words the tax is not levied because of the classification of the road as provided in the act of 1898, but because of a rate-making power granted in the charter. It is an attempt by the exercise of the taxing power to specially burden a particular clause, or right, in the charter and by increasing that burden to the point of prohibition, to destroy the right. It is an indirect and insidious attempt to impair the force of the contract made by the state, the validity of which has been upheld by this court, under the guise of taxing its exercise.

On the general proposition that a state may not pass any act impairing the obligations of a contract, and of the existence and validity of this contract there can be no doubt, since this court has upheld it, the discussion by the supreme court of the United States in the case of *Fletcher* v. *Peck,* 9 Cranch, 87, is conclusive.

Said Chief Justice MARSHALL in *Marbury* v. *Madison,* 1 Cranch, 137:

"The government of the United States has been emphatically termed a government of laws and not of men, and it will certainly cease to deserve the high appellation if the laws furnish no remedy for the violation of a vested legal right."

In *Poindexter* v. *Greenhow,* 114 U. S., 270, the supreme court of the United States said:

"What we are asked to do is, in effect, to overrule the doctrine in *Fletcher* v. *Peck,* 9 Cranch, 87, and hold that a state is not under a constitutional obligation to perform its contracts; for it is equivalent to that to say that it is not a subject to the consequences when that constitutional prohibition is applied to suits between individuals. We could not stop there. We should be required to go still further, and reverse the doctrine on which that constitutional prohibition rests, stated by Chief Justice MARSHALL in that case, when he said, 'When, then, a law is in its nature a contract, when absolute rights have been vested under that contract, a repeal of the law can-

not divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual of the community. It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power, and if any be prescribed, where are they to be found if the property of an individual fairly and honestly acquired, may be seized without compensation? To the legislature all legislative power is granted; but the question whether the act of transferring the property of an individual to the public be in the nature of legislative power, is well worthy of serious reflection. And in view of such a contention, we may well add the impressive and weighty words of the same illustrious man, when he said in *Marbury* v. *Madison,* 1 Cranch, 137, 'The government of the United States has been emphatically termed a government of laws, not of men.' It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right." . . .

"The true and real commonwealth which contracted the obligation is incapable, in law, of doing anything in derogation of it. Whatever having that effect, if operative has been attempted or done, is the work of its government acting without authority, in violation of its fundamental law, and must be looked upon, in all courts of justice, as if it were not and never had been." . . .

"Virginia, by a contract which the constitution of the United States disables her from impairing, has bound itself that it shall be otherwise. The state has agreed that the coupons cut from her bonds shall be received in payment of taxes due to her, as though they were money. When the taxpayer has tendered such coupons, he has complied with the agreement, and in legal contemplation has paid the debt he owed the state. So far as that tax is concerned and every step taken for enforcing its payment in disregard of that tender, the coupon holder is withdrawn from the power and jurisdiction

of the state. He is free from all further disturbance, and is securely shielded by the constitution in his immunity. No proceeding, whatever its pretext, which does not respect this right, can be judicially upheld. The question is not of the reasonableness of a remedy for a breach of the contract to receive the tendered coupons in payment of the tax; it is whether the right to have them so received, and the use of that right as a defense against all further efforts to exact and compel payment of the tax, in denial and defiance of that right can be taken away without a violation of that provision of the constitution which prohibits the states from passing laws which impair the obligations of contracts. Certainly, a law which takes from the party his whole contract, and all the rights which it was intended to confer must be regarded as a law impairing its obligation."

So strictly has the prohibition against the impairment of the obligation of contracts been enforced that it has been repeatedly held that it is incompetent for a state to so materially change the remedy as to any existing contracts as to seriously impair or impede proceedings upon it.

"Nothing is more material to the obligation of a contract than the means of its enforcement. The idea of validity and remedy are inseparable, and both are parts of the obligation which is guaranteed by the constitution against impairment. The obligation of a contract is the law which binds the parties to perform their agreement. Any impairment of the obligation of a contract, the degree of impairment is immaterial, is within the prohibition of the constitution. The states may change the remedy, provided no substantial right secured by the contract is impaired. Whenever such a result is produced by the act in question, to that extent it is void. The states are no more permitted to impair the efficacy of a contract in this way than to attack its vitality in any other manner. Against all assaults coming from that quarter, whatever guise they may assume, the constitution applies with the same force

and effect, securing the substantial means of enforcement of a contract which existed when it was made. The guaranty of the constitution gives it protection to that extent. *Von Hofman* v. *Quincy,* 4 Wall, 535; *Walker* v. *Whitehead,* 16 Wall, 314; *Poindexter* v. *Greenhow,* 114 U. S., 270.

In *St. Ann's Asylum* v. *New Orleans,* 105 U. S., 362, it was held, Mr. Justice BRADLEY speaking for the court, that the imposition of a tax contrary to the terms of a charter could not be justified under the state's rights to dissolve a corporation, the idea of a tax being to destroy the franchise.

If the power to dissolve a corporation cannot be exercised by taxation, does it not follow as a necessary consequence that a valid grant cannot be destroyed by the use of the taxing power? In other words the state cannot indirectly avoid the force of its contract by placing such an embargo upon its exercise as to make it impossible to enjoy it.

The case of *Murray* v. *Charleston,* 96 U. S., 432, is nearly in point. In that case the City of Charleston had issued certain certificates which were known as stock in the city, but which were in reality, evidences of indebtedness. Some of these were held by Murray, a resident of Germany. The city, acting under a very ancient charter antedating indeed the constitution of the United States, undertook to domicile within the city all of the indebtedness due by the city for the purpose of taxation, and levied a tax thereon. In order to secure payment it provided that the amount of the tax should be deducted from the interest due on the debt, and that the said interest should be paid, less the amount of the taxes levied. The attempt was held unconstitutional and the language of the court is exceedingly appropriate to the instant case. We quote:

\* \* \* \* \* \* \* \* \* \*

"What then is meant by the doctrine that contracts are made with reference to the taxing power resident in the state, and in subordination to it? Is it meant that when a person lends

money to a state, or to a municipal division of the state having the power of taxation, there is in the contract a tacit reservation of a right in the debtor to raise money out of the contributions promised to be paid before payment? That cannot be, because if it could, the contract (in the language of Alexander Hamilton) would involve two contradictory things an obligation to do, and a right not to do—an obligation to pay a certain sum, and a right to retain it in the shape of a tax. It is against the rules, both of law and of reason, to admit by implication in the construction of a contract, a principle which goes in destruction of it. The truth is, states and cities when they borrow money and contract to repay it with interest are not acting as sovereignties. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar contracts between private persons. Hence, instead of there being in the undertaking of a state or city to pay a reservation of a sovereign right to withhold payment, the contract should be regarded as an assurance that such a right will not be exercised. A promise to pay, with a reserved right to deny or change the effect of the promise, is an absurdity. . . .

"The obligation of a contract depends upon its terms and the means which the law in existence at the time affords for its enforcement. A law which alters the terms of a contract by imposing new conditions, or dispensing with those expressed, is a law which impairs its obligations; for such a law . . . relieves the parties from the moral duty of performing the original stipulations of the contract and it prevents their legal enforcement.

"We do not care now to enter upon the consideration of the question whether a state can tax a debt due by one of its citizens or municipalities to a nonresident creditor, or whether it has any jurisdiction over such a creditor or over the credit he owns. Such a discussion is not necessary, and it may be doubtful whether the question is presented to us by this record.

It is enough for the present case that we hold, as we do, that no municipality or state can, by its own ordinances, under the guise of taxation, relieve itself from performing, to the letter, all that it has expressly promised its creditors."

What was thus said, it is true, was in a case where the question was, whether a tax thus imposed upon a nonresident holder of bonds issued by a company chartered by the state, was warranted by the constitution. But so far as it speaks of what constitutes impairment of the current obligation it is applicable, in its fullest extent to all legislation affecting contracts, no matter who may be the parties.

See also *N. Y., L. E. & W. Ry. Co.* v. *Penn.*, 153 U. S., 628.

Is it permissible for the state, after having granted to a railroad company the right to fix its own charges for transportation of persons and freight, within maximum and minimum limits, beyond the control of the legislature, to make the claim of such a grant, its ownership or exercise, an independent subject of taxation; or can the state tax such a company more than it taxes other like companies not having such a grant, for carrying on the same business?

If the legislature can tax such a grant to the extent of $10 per mile it can tax it $10,000 per mile. If the power exists there is no limit to it. If the purpose or effect of the law is to destroy the grant then the law is void.

A perfectly parallel case to those under consideration arose in the early days of the government and was decided by the supreme court of the United states in a masterly opinion by Chief Justice MARSHALL. *Weston* v. *Charleston*, 2 Peters (U. S.), 449.

There the City of Charleston by an ordinance undertook to tax "stock of the United States"; the stock being simply an evidence of a contract by which the general government obligated itself to repay borrowed money. The act of congress authorizing the issuance of the stock did not, as do many subsequent acts providing for the issuance of bonds, expressly

exempt the stock from taxation. The supreme court of the United States treated the ordinance in question as standing upon the same basis as would an act of the state legislature and held it void, deciding:

(a) That the stock was nothing but the evidence of a debt created by the general government in the exercise of its power "to borrow money on the credit of the United States."

(b) That the tax sought to be laid, while nominally upon the stock, the evidence of the contract, was in fact on the contract itself and, therefore, a tax on the power of congress to borrow money on the credit of the United States.

(c) That a tax upon a power, a right to do a particular thing, is a burden on the exercise of the power, a burden on the right to do.

The application of *Weston* v. *Charleston,* to the cases before us is plain. Only by implication are the states forbidden to encroach upon or impair the powers of congress to borrow money on the credit of the United States, they are expressly prohibited from impairing the obligations of a contract; certainly the express prohibition is not of less force than the implied one.

If, as decided by the supreme court of the nation, speaking through Chief Justice MARSHALL, a tax levied upon the evidence of a debt created by a contract be in fact upon the contract itself and an impairment of the power of the general government to make that contract, surely the statute in question (Laws 1898, sec. 66, p. 23) seeking to impose an additional privilege tax on "each railroad claiming exemption from the state supervision under maximum and minimum provisions in their charters, is a tax upon the contract evidenced by the charter, and therefore, a tax upon the right granted by the contract."

If, as decided by the supreme court of the nation, speaking through the same distinguished chief justice, a tax upon a power, a right to do a particular thing, is a burden on the

exercise of the power, a burden on the right to do, surely the tax in question in these cases is a burden on the appellant's right, within certain limits to be exempt from supervision by the railroad commission and an impairment of the contract by which the state granted appellant such exemption.

It was held in *McCullough* v. *Maryland,* 4 Wheaton, 316, 436, that a state had no power by taxation to impede, burden or in any manner control the operation of the constitution and laws enacted by congress to carry into execution the powers vested in the general government and this doctrine was amplified and applied in *Weston* v. *Charleston, supra.*

A state has no power, by taxation or otherwise, to impair the obligation of a contract; this want of power is just as absolute as is the want of power to impede, burden or in any manner control the operation of the constitution and laws enacted by congress. If to tax a contract be to burden the right to make it or to act under it, and we have seen that it is, then it follows that the statute in question impairs the obligation of the nineteenth section of appellant's charter and is void.

*Brown* v. *Maryland,* 12 Wheaton, 419, is worthy of note in this connection. In that case it was concluded that a license tax required of an importer to sell his goods, while held in bulk as imported, was a tax upon his occupation, but the court decided that this was only changing the form without varying the substance of the tax, adding that "it is treating a prohibition which is general as if it were confined to a particular mode of doing the forbidden thing. All must perceive that a tax on the sale of an article, imported only for sale, is a tax on the article itself."

The tax under consideration in these cases is nothing less than a tax on the charter exemption; the contract made by the state granting the exemption to the appellant. This contract can no more be impaired by taxation than it can be impaired in any other way. The cases above cited are all approved in

the more recent case of *Home Insurance Co.* v. *New York,* 134 U. S., 594.

Whatever the state may do, even with the creations of its own will, it must do in subordination to the inhibitions of the federal constitution. *County of Santa Clara* v. *Southern Pac. Railway Co.,* 18 Fed., 385, 406. Of course the state cannot impair the obligation of its own contract and it seems to us to be clear that to tax the state's contract is to impair it and that the tax under consideration is sought to be laid upon the contract.

If to tax a power of the federal government is to impair it, how much more is a tax upon a contract granting an exemption an impairment of it? Suppose, instead of an exemption from supervision, an exemption, a perfectly valid one, from taxation itself were before the court. We would then have the state granting an exemption from taxation and then taxing the exemption. Of course such a tax would not only be void but absurd, a contradiction in terms. If the state place herself under obligation not to exact taxes from a party she cannot at the same time bind the party to pay her taxes in whole or in part. There is no difference in principle where the exemption sought to be avoided is one from taxation or one of the kind involved in the consideration of this case.

McGehee, in his work on "Due Process of Law," p. 63, tells us that a statute is invalid if its ostensible purpose be seen to be a mere cover for carrying out purposes having no relation to the classification adopted, citing *Lochner* v. *New York,* 198 U. S., 45.

The history of the statute under consideration leaves no room to doubt that its real purpose was and is to force appellant, and the Yazoo & Mississippi Valley Railroad Company to surrender their contract exemption from supervision and every member of this court must know the fact to be as stated.

The grant under consideration is one that has been ad-

judicated to be valid. *Stone* v. *Natchez, etc., R. R. Co.,* 62 Miss., 646; *Mississippi Railroad Commission* v. *Gulf, etc., R. R. Co.,* 78 Miss., 750. The right given by the grant being beyond legislative power to revoke, is equally beyond legislative power to impair. While the right is one created by law, it has all the sanctity of a natural right and is removed beyond legislative power to as great an extent as any natural right can be so removed.

The legislature, of course, has power to tax property and to impose privilege taxes on persons and occupations, but it must exercise such power so as to make the burdens of government equal and uniform, so far as concerns property at least, and when it comes to impose licenses and privilege taxes arbitrary classification is forbidden. We have said the right granted by its charter to appellant to fix its own charges for transportation of persons and freight within the statutory limits is removed from legislative control to as great an extent as is any natural right. Suppose a $10 privilege tax was sought to be imposed on all lawyers, and an additional privilege tax of $10 on all of them who had blue eyes. What would the courts say of such classification? Unquestionably a law so providing would be held void, the classification would be held arbitrary and unreasonable. It would be no answer to say that oculists all agree that blue eyes are the best and most valuable of eyes, or to prove their superiority by all the experts on the subject. Nor, in this case, is it any answer to our contention to claim that the grant is itself a thing of value. Personal beauty is a thing of value, but not a subject of taxation. Those whom God hath created handsome are not subject to an additional privilege tax for carrying on any occupation that may be classified for taxation, although a pleasing form and pleasant face may have real value in helping a man along in the world. Eloquence is valuable to the advocate yet the court would not tolerate a law which imposed a $20 privilege tax on eloquent barristers and only $10 on

those not gifted in speech. Such a classification would be arbitrary and unreasonable. It would infringe upon a natural right. But the grant to appellant, we again repeat, is as far removed from legislative power as a natural right.

If the exemption granted to appellant by the legislature be a thing of value it was granted for a consideration. Can the legislature turn upon its own grantee and deprive it either directly or indirectly of anything which passed by the grant? If the grant were a gift, still a good and perfect gift invests the donee with all that is given. The fact that the exemption came from the state, either by a grant for a valuable consideration or by donation, does not and cannot increase the state's power over it, directly or indirectly. The state's power of taxation is not increased by the source whence the right sought to be taxed was acquired.

The language of the statute is peculiar. By the first section of the act (Laws 1898, p. 5) it is provided that "a privilege tax is levied as follows on the following industries carried on in this state, to-wit," which is appropriate for levying privilege taxes, but when we come to sec. 66, "Railroads," there is a departure from the provisions of the first section. It is said (sec. 66) "privilege taxes are levied on them (Railroads) as follows," etc. Railroads are not industries, any more than lumber or corn is an industry. If the pretended privilege tax is a gross sum levied on railroad tracks, engines, cars, etc., the statute is unconstitutional clearly as violative of sec. 112, Constitution of 1890; not only is equality and uniformity violated, but the matter of value is ignored. One of the classifications of railroads, made in the section by the legislature itself, is the "narrow gauge class" evidently referring to the width of track, and the tax is so much per mile of track, thereby showing that the term "railroads" is used throughout the section in the sense of being property. Property cannot be classified for privilege taxes according to the claims or even the rights of its owners, imposing a greater

tax on the same kinds of property of the same value and put
to the same use, because of such claims, or rights without
denying to those owners whose property is thus subjected to
the greater tax the equal protection of law.

If, however, the privilege taxes specified in the section (66)
be upon the persons, corporations or companies owning or
operating railroads, or upon the business of operating rail-
roads, the case is not helped; for the act unjustly discriminates
against those persons, corporations or companies operating rail-
roads who claim to have, or really have, the right of exemp-
tion from supervision and denies them the equal protection
of the law. A privilege tax of $15 is levied by the act on
each peddler on foot in each county. Suppose the act went
further and provided an additional tax of $10 on each peddler
on foot in each county who claimed the right to be exempt from
jury service, because over sixty years of age. Would not such
a classification for taxation be arbitrary and invalid? Would
it not be denying the claimant of such exemption the equal
protection of the law? It would be a tax upon the exemption.
Such an exemption is of value, but it is a mere right given
by law. It is neither an occupation nor an industry.

The right of the railroads to claim exemption from super-
vision is a right given by law; it is not an industry, nor is
it, aside from the exemption itself, property within the defini-
tions given of the term by our statute, in force when this suit
was begun, Code 1892, §§ 1513, 1514. Is the claim taxable
at all?

If the $10 additional privilege tax be on the railroad prop-
erty it can only be levied equally and uniformly and accord-
ing to value, constitution, sec. 112; if it be upon the owners
of the railroads it is a greater tax than is imposed upon the
owners of other like property put to the same use, because of
their claim to a right granted them by law, which right is
beyond legislative control, and denies them the equal protec-
tion of the law. If the additional tax be upon the claim itself,

it is not only in the nature of a penalty for making the claim but it is a tax on that which is neither property, nor an industry, nor an occupation. You had just as well tax every man who is, or claims to be, left handed.

*If the additional tax be upon the exemption, as property, then it is void because not levied according to value.* Constitution 1890, sec. 112.

It is manifest that the act of 1898 seeks to impose the taxes upon the property, or the exemption which is property, of the railroad. Suppose after the tax is due under the terms of the act a railroad company should sell all its property, who would be liable for the tax? Would the old company alone be liable or would the new company become the debtor therefor, or would the property remain liable? Read the section (66) and answer. If the property would be liable, then the tax is on the property, and the act is void, since property can only be taxed equally and uniformly and according to value. But if the tax be held to be upon the corporation or railroad company, although called a privilege tax, yet it is a tax on the property of the corporation or company. *Grand Gulf, etc., R. R. Co.* v. *Buck,* 53 Miss., 246, a case in which a privilege tax sought to be levied on the railroad company was held by this court to be within an exemption of "the capital stock of the company and all other property belonging to or connected with said railroad."

We commend to the court specially the language of the supreme court of the United States on the subject of appellant's charter, and in approval of the *Buck case, supra. Gulf & Ship Island Railroad* v. *Hewes,* 183 U. S., par. 4, beginning p. 76, 77, 78.

It is no answer to any part of the argument to say that this court has decided that a right to sell intoxicants is a franchise and is taxable, citing the old Mississippi cases to that effect, as was done by opposing counsel in the court below. There are two sorts of franchises, those which are mere licenses,

like a license to sell intoxicating liquors, into which no element of contract enters. There are other franchises which have their origin in legislative or charter contracts. Such is the franchise granted to the railroad company under consideration. A contract granting a franchise is within constitutional protection; the obligations of a contract granting a franchise can no more be impaired by the state than any other contract.

The tax sought to be collected in these cases is not laid upon all railroads, and the statute of which it is predicated unjustly discriminates against appellant, depriving it of · property without due process of law and denying it the equal protection of the law, contrary to the fourteenth amendment of the constitution of the United States. There is no merit in the contention that the tax is imposed upon a class of railroads, since the pretended classification is unreasonable and void. The following authorities are instructive and applicable to the case, and as we think, conclusive in appellant's favor.

The Tennessee act of 1883 for the regulation of railroads was held to be invalid because by its express terms (sec. 29) it did not apply to any railroad being constructed or which should thereafter be constructed for ten years next following. The discrimination between existing roads and those thereafter to be constructed was held to be unreasonable. *Louisville, etc., R. R. Co.* v. *Railroad Commission of Tennessee,* 19 Fed., 679, 695.

The Florida "Jim Crow Law" enacted in 1905, was held to be violative of the fourteenth amendment of the constitution of the United States because its seventh section specified "that the provisions of the act should not apply to colored nurses having the care of white children or sick white persons." *State* v. *Patterson,* 50 Fla., 127, s.c., 39 South., 398.

In Kentucky the legislature conceived that it would compel a railroad company to pay the entire costs of a fence separating its donated right of way from the lands of adjoining proprietors, although all other partition fences were to be

paid for jointly by the parties in interest, but the supreme court of that state could find no basis for the exception, and adjudged the statute to be void. *Ohio, etc., R. R. Co.* v. *Todd,* 15 S. W., 56.

The state constitution of California contained a section in terms providing that the value of mortgage liens on lands might be deducted from the value of the land in assessing the same for taxation, but that railroads should not have the benefit of such deduction. The provision was adjudged to be violative of the fourteenth amendment to the United States constitution and consequently void. *County of Santa Clara* v. *Southern Pacific Railway Company,* 18 Fed., 385.

An amendment to the constitution of Missouri, in terms substantially like the section of the California constitution just mentioned, was submitted and adopted, but held void because it did not afford "equal protection of the laws" guaranteed by the fourteenth amendment to the federal constitution, the inequality consisting in the exception as to corporations made therein. *Russell* v. *Croy,* 164 Mo., 69, s.c., 63 S. W., 849.

A Montana statute sought to impose a $25 license tax per quarter on every laundry business, other than a steam laundry, wherein more than one person was employed or engaged, and $15 per quarter upon steam laundries, but it was adjudged void because it denied the equal protection of the laws, contrary to the fourteenth amendment to the federal constitution. *In re Yot Sang,* 75 Fed., 983.

An Illinois statute, defining trusts and conspiracies against trade and declaring contracts illegal which contravene its provisions was adjudged invalid because of an exception from its operation of agricultural products and live stock while in the hands of the producer, since the exception made the statute repugnant to the fourteenth amendment to the federal constitution. *Union Sewer Pipe Co.* v. *Connelly,* 99 Fed., 354.

An Alabama statute was adjudged void which sought to subject laborers and renters to penalties for breach of contract

not imposed on other classes of persons. *Peonage Cases,* 123 Fed., 671.

A city ordinance prohibiting the sale of clothing on Sunday, all other sales being permitted, was adjudged to be void by the Colorado supreme court on the ground of its being class legislation and prohibited as denying the equal protection of the laws. *City of Denver* v. *Bach,* 46 L. R. A., 848.

An Indiana statute undertook to impose upon municipalities a duty to pay more for a day's labor on public works than the market value of the same, but it was adjudged void as depriving the taxpayers of their property without due process of law. *Street* v. *Varney, etc., Co.,* 61 L. R. A., 154.

A Kansas statute, providing for a fire tax, but excluding the property of a railroad company on which the tax was levied from its benefits, was held violative of the fourteenth amendment of the constitution of the United States. *Atchison, etc., R. Co.* v. *Clark,* 60 Kan., 826, s.c., 47, L. R. A., 77.

An Indiana statute seeking to require merchants and coal miners to redeem in money checks issued in payment of assigned wages was adjudged by the supreme court of that state to be class legislation. *Dixon* v. *Poe,* 60 L. R. A., 308.

This court adjudged an exemption from taxation of a designated class of debts invalid because an unreasonable classification, and although the decision was based on other constitutional provisions yet it could well have been placed upon the fourteenth amendment to the constitution of the United States. *Adams, State Rev. Agent* v. *Kuykendall,* 83 Miss., 571, s.c., 35 South. Rep., 830.

And this court in two recent well considered cases, held a municipal ordinance in one of them and an act of the legislature in the other, each purporting to impose a privilege tax only on persons doing a money lending business securing loans by liens on designated kinds of personal property to be violative of the Constitution 1890, sec. 14 and the fourteenth amendment to the federal constitution, providing that a person shall

not be deprived of property without due process of law, and the latter further providing that a person shall not be deprived of the equal protection of the laws. The pretended classification was unreasonable. *Rodge* v. *Kelly,* 88 Miss., 209, s.c., 40 South. Rep., 552; *Hyland* v. *Sharp,* 88 Miss., 567, s.c., 41 South. Rep., 264.

We do not of course deny the power of the legislature to classify persons and property for taxation, but the same must be done, if at all, without violating any provision of the state or national constitutions. There must be some reasonable ground for a classification if made; a valid classification "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." *Gulf, etc., R. R. Co.* v. *Ellis,* 165 U. S., 150.

In a recent very able work, "Limitations of Taxing Power and Public Indebtedness," by Gray, it is said, speaking of classification for privilege taxes, sec. 1432, "In order that the classification shall be legal each class shall have purposes to subserve peculiar to itself, and all of its members local functions to be performed which differentiates them from the members of each and every other class."

*Mayes & Longstreet,* for appellant, Yazoo & Mississippi Valley Railroad Company.

The exaction of an extraordinary and additional privilege tax beyond that required to be paid by other railroads doing similar business in this state—such exaction being made solely because the defendant enjoys the contract privilege of its charter—is an impairment of the obligation of that charter privilege. It is to extend a privilege to this company by its charter-contract in order to induce the building of the road with one hand, and afterwards, practically, to take it away with the other.

The terms of the privileges extended in the charter are such that the right of the railroad company to fix its own rates is not without limit. There is a maximum limit. For this reason it is obvious that it cannot be said that if this additional privilege tax is laid on the company because of its enjoyment of this immunity, it can recoup itself by raising the rates. It cannot do so. It might possibly so recoup itself as to compensate for a $10 imposition; but this is a question of principle and not of quantity. If the legislature can lay this imposition to the extent of $10 per mile, it has just as much right to lay it to the extent of $1,000 a mile, or $10,000 per mile. If it can lay an additional privilege tax upon the company not required to be paid by other railroads for the reason solely that the company has the right to regulate its own rates, then it is obvious that it can very easily lay this privilege tax so high (that is to say, so long as there is a maximum limit contained in the charter) as to force the company either to surrender its charter privilege or else actually to lose money by holding onto it.

This act of 1898 was of course passed subsequently to the charter which was granted in 1882, and it is settled that any law subsequent to the contract, directly annulling it, or changing its terms by adding or imposing material conditions, provisions or stipulations, presents a clear case of the direct impairment of the obligation.

15 Am. & Eng. Ency. Law (2d ed.), 1047. The statute imposes a burden on the corporation as a condition or penalty for further exercise of the corporate right which is conferred by its charter. 15 Am. & Eng. Ency. Law (2d ed.), 1049; *Commonwealth* v. *New Bedford Bridge,* 2 Gray, 239; *Bridge Co.* v. *State,* 18 Conn., 53; *Navigation Co.* v. *Coon,* 6 Pa. St., 47.

It cannot be said that there is anything in the taxing power of the state which takes this case from under the operation of these general principles.

We recognize fully the reluctance felt and frequently expressed by the supreme court of the United States so to apply the constitution of the United States as to impose limitations on the taxing power of the state; but even then it is well settled that the taxing power may be so wrongfully applied as both to impair the obligations of a contract and to deprive of property without due process of law, thereby violating the fourteenth amendment. We suppose it will hardly be necessary to cite authorities to sustain these propositions, but nevertheless, see *Hanford* v. *Davies,* 163 U. S., 273; *Henderson Bridge Co.* v. *Henderson,* 173 U. S., 592, 614 and 618, *et seq.*

*Green & Green,* for appellee in all the cases.

The contract of appellant, Gulf & Ship Island Railroad Company, contained in sec. 10 of its charter, and the same is true of sec. 6 of the other appellant's charter, provides: "That this company shall have and possess the power of fixing from time to time the rates at which it will do express and telegraph business, and transport other express as may apply for transportation over its lines at a just and reasonable rate of compensation, and also the rates at which said company will transport persons or property over its railroad or branches," between certain maximum and minimum rates.

By this demurrer appellant admits that every right conferred by the express terms of the contract is now enjoyed to the fullest extent.

In *Stone* v. *Yazoo, etc., R. R. Co.,* 62 Miss., 607, it is declared: "That it was the legislative intent to vest in the appellee the unrestricted right to fix rates within the limits prescribed by the charter is clear; that this was a valid contract by the state, obligatory and inviolable by it, we regard as settled authoritatively by federal and state decisions too numerous for citations."

The obligation of this contract is inviolate, but this franchise cannot create an exemption from taxation, from bearing

its just proportion of the public burden, and this because:—

1. There is no power to create .an irreparable exemption by a special charter to a special corporation. The constitution of 1869 as construed in the masterly opinion of *Adams* v. *Yazoo, etc., R. R. Co.,* 76 Miss., 545, s.c., 25 South., 366; *Id.* 77 Miss., 194, 24 South., 200, 317; *Id.* 77 Miss., 782; *Id.,* 81 Miss., 90; *Id.,* 180 U. S., 1; *Adams* v. *Tombigbee Mills,* 78 Miss., 676, 29 South., 470, demonstrates (a) that the legislature was without power to grant a special exemption to a special corporation; and (2) an irreparable exemption; (b) and under the facts hold that appellant had lost any exemption created by its charter. These cases are conclusive, because they demonstrate that appellant had no contract for any exemption from taxation, and that it was subject to the taxing power. Contract being made by the legislature which was for this purpose but a special agent of the people, and which by the express terms of the constitution was prohibited from granting exemptions from taxations that were irreparable, or by a special charter, to special corporations, make a contract with appellant whereby a franchise is brought into existence. This franchise is property for, as said by the supreme court of the United States in *Railway Co.* v. *New York,* 199 U. S., 1:

"Indeed growing out of the conditions of modern business, a large proportion of valuable property is to be found in intangible things like franchises. We had occasion to review this subject in *Adams Ex. Co.* v. *Ohio,* 166 U. S., 185, where we said at p. 218:

" 'In the complex civilization of to-day a large proportion of the wealth of a community consists in intangible property, and there is nothing in the nature of things or in the limitations of the federal constitution which restrains a state from taxing at its real value such intangible property. . . . It matters not in what this intangible property consists—whether privileges, corporate franchises, contracts, or obligations. It

is enough that it is property which, though intangible, exists, which has value, produces income, and passes current in the markets of the world. To ignore this intangible property, or to hold that it is not subject to taxation at its accepted value, is to eliminate from the reach of the taxing power a large portion of the wealth of the country' "

In *State Railroad Tax Cases,* 92 U. S., 575, 603, is this language by Mr. Justice MILLER speaking for the court:

"That the franchise, capital stock, business and profits of all corporations are liable to taxation in the place where they do business, and by the state which creates them, admits of no dispute at this day. 'Nothing can be more certain in legal decisions,' says this court in *Society for Savings* v. *Coite,* 6 Wall., 607, 'than that the privileges and franchises of a private corporation and all trades and avocations by which the citizens acquire a livelihood, may be taxed by a state for the support of a state government.' *State Freight Tax Case,* 15 Wall., 232; *State Tax on Gross Receipts,* 15 Wall., 284."

A privilege tax may be imposed upon a franchise. *Gas Co.* v. *County,* 109 U. S.; *Railroad Co.* v. *New Orleans,* 143 U. S., 195.

In *Kehrer* v. *Stewart,* 197 U. S., 69: "As we have frequently held, the state has a right to classify occupations and to impose different taxes upon different occupations. Such has been constantly the practice of congress under the internal revenue laws. *Coon* v. *Marshall,* 196 U. S., 261, 275. What the necessity is for such tax, and upon what occupations it shall be imposed as well as the amount of the imposition, are all exclusively within the control of the state legislature."

The legislature being without power to create an exemption from the taxing power, and this franchise being property, and being subject to the taxing power, the legislature could not avoid the constitutional prohibition by indirection. The inherent power in the legislature was wanting and to successfully maintain contention of appellant it is a condition prece-

dent that some party competent to bind the state should have made a contract valid before any constitutional inhibition could be invoked, but under unanimous and repeated decisions of this court, affirmed by the supreme court of the United States, the constitution of 1869 has fixed unalterably the power of taxation, and declared in unmistakable terms that all property is subject to taxation, but not necessarily subjected thereto.

The last utterance directily in point from the supreme court of the United States is the elaborately briefed case wherein Hon. Elihu Root and William B. Guthrie were unsuccessful, and therein Mr. Justice BREWER said (199 U. S., 1):

"The main contention is that this tax legislation impairs the obligation of contracts. It must be borne in mind that presumptively all property within the territorial limits of a state is subject to its taxing power. Whoever insists that any particular property is not so subject as the burden of proof, must make it entirely clear that, by contract or otherwise, the property is beyond its reach. In *Providence Bank* v. *Billings,* 4 Pet., 514, 7. L. Ed., 939, Mr. Chief Justice MARSHALL, in delivering the opinion of the court, said (p. 561, L. Ed. 955):

"That the taxing power is of vital importance, that it is essential to the existence of the government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that a relinquishment of such a power is never to be assumed. We will not say that a state may not relinquish it, that a consideration sufficiently valuable to induce a partial release of it may not exist; but, as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear."

"In *Vicksburg, etc., Ry. Co.* v. *Dennis,* 116 U. S., 665; 29 L. Ed., 770, 6 Sup. Ct. Rep., 625, Mr. Justice Gray cited many authorities, quoting the different phraseology in which, by the several writers of the opinions, the same rule was an-

nounced. In *Wells* v. *Savannah,* 181 U. S., 531, 45 L. Ed., 986, 21 Sup. Ct. Rep., 697, the law was thus stated by Mr. Justice PECKHAM (p. 539, L. Ed., p. 991, Sup. Ct. Rep., p. 700):

" 'The payment of taxes on account of property otherwise liable to taxation can only be avoided by clear proof of a valid contract of exemption from such payment; and the validity of such contract presupposes a good consideration therefor. If the property be, in its nature, taxable, the contract exempting it from taxation must, as we have said, be clearly proved. It will not be inferred from facts which do not lead irresistibly and necessarily to the existence of the contract. The facts proved must show either a contract expressed in terms, or else it must be implied from facts which leave no room for doubt that such was the intention of the parties, and that a valid consideration existed for the contract. If there be any doubt on these matters, the contract has not been proven, and the exemption does not exist.'

"In *Chicago Theological Seminary* v. *Illinois,* 188 U. S., 662, 47 L. Ed., 641, 23 Sup. Ct. Rep., 386, the same justice declared (p. 672, L. Ed., 648, Sup. Ct. Rep., 387):

"The rule is that, in claims for exception from taxation under legislative authority, the exemption must be plainly and unmistakably granted; it cannot exist by implication only; a doubt is fatal to the claim." See also *Erie R. R. Co.* v. *Pennsylvania,* 21 Wall., 492; 22 L. Ed., 595; *Wilmington & W. R. R. Co.* v. *Alsbrook,* 146 U. S., 279, 36 L. Ed., 972, 13 Sup. Ct. Rep., 72; *Ford* v. *Delta & Pine Land Co.,* 164 U. S., 662, 41 L. Ed., 590, 17 Sup. Ct. Rep., 230.

"This rule is akin to, if not part of, the broad proposition, now universally accepted, that in grants from the public, nothing passes by implication. As said by Mr. Chief Justice TANEY, in *Charles River Bridge* v. *Warren Bridge,* 11 Pet., 549, 9 L. Ed., 773, 824:

" 'The inquiry, then, is, does the charter contain such a con-

tract on the part of the state? Is there any such stipulation to be found in that instrument? It must be admitted on all hands that there is none—no words that even relate to another bridge or to the diminution of their tolls, or to the line of travel. If a contract on that subject be gathered from the charter, it must be by implication, and cannot be found in the words used. Can such an agreement be implied? The rule of construction before stated is an answer to the question. In charters of this description no rights are taken from the public or given to the corporation beyond those which the words of the charter, by their natural and proper construction, purport to convey. There are no words which import such a contract as the plaintiffs in error contend for, and none can be implied.'"

No express contract in this provision having been made and it being beyond the power of the legislature so to make a contract none will be implied. *Delaware Tax cases; Railroad Co.* v. *Adams,* 77 Miss., 262, 25 South., 355; Brame & Alexander Digest, 1121. The law never raises by implication a contract which would be contrary not only to the statutes but to the constitution, *i. e.,* a special exemption to a special corporation by virtue of a special charter. There being no contract for exemption from taxation and it being beyond the power of the legislature directly to make such a contract, no such contract will be implied.

*Adams case, supra; Bank* v. *Billings,* 4 Pet., 559 (opinion by MARSHALL, C. J.); *Gas Co.* v. *County,* 109 U. S. (1883), 400; *New Orleans Co.* v. *New Orleans,* 40 Ann. (1888), 588; s.c. affirmed, 142 U. S. (1891), 195; *Debolt* v. *Trust Co.,* 1 Ohio St. (1853), 573; s.c. affirmed, 16 How., 416; *Railroad Co.* v. *Railroad Co.,* 63 Vt., 21; *Osborne* v. *Nicholson,* 13 Wall., 660; *Bridge Co.* v. *Dix,* 6 How., 536; *Railroad Co.* v. *Pennsylvania,* 163 U. S., 647; *Railroad Co.* v. *Philadelphia,* 101 U. S., 540; *Minot* v. *Railroad Co.,* 17 Fed. Cas., 461; *Railroad Co.* v. *Maryland,* 10 How., 393; *Railroad Co.* v. *Commonwealth,* 10 Bush., 47; *St. Louis* v. *Bank,* 49 Md.,

574; *Railroad Co.* v. *Maguire,* 49 Mo., 491; *Farrington* v. *Tennessee,* 95 U. S., 689; *Tel. Co.* v. *Harris,* 52 S. W., 748; *Wyandotte* v. *Corrigan,* 35 Kan., 24; *Turnpike cases,* 92 Tenn. 369; *The People* v. *Detroit,* 1 Mich., 458; *People* v. *Commissioners,* 76 N. Y., 77; *Association* v. *Norman,* 98 Ky., 294; *Reed* v. *Beall,* 42 Miss., 472; *Coulson* v. *Harris,* 43 Miss., 738; *Drysdale* v. *Pradat,* 45 Miss., 445; *Portwood* v. *Baskett,* 64 Miss., 216, s.c., 1 South., 105.

There being no contract for exemption from taxation, there is no impairment of the obligation of the contract to fix rates, if the state remains bound and there is no alteration of the clearly expressed terms of the act.    The appellant is now fixing its rates, and it is doing everything that these sections of its charter give it the right to do; and with this express contract the state has never attempted to make any alteration, nor to deprive it of one thing which was granted to it thereby.    Under the settled law in these cases the legislature was without power to contract away the taxing power, either directly or indirectly, and could pass no act compassing this end, be it a charter or anything else—the charter granting power in the legislature under the constitution did not extend to granting special exemptions from taxation to special corporations by special charters. The state has not atempted to say: "You shall not exercise the power given to fix your rates."    On the contrary, it has said: "Continue to fix your rates in accordance with the charter; but as this right is a valuable franchise, for it you must pay a tax for the support of the government, to the end that the same may be effective under its protection."    Should the appellant file a bill praying that the court decree the specific performance of the contract evidenced by this section, the state would put in a disclaimer of having interferred with its performance by this act.    But for the sake of argument, let us admit that the legislature had this power to exempt from taxation.

No exemption from taxation arises by grant of franchises. This court is asked to decide that a co-ordinate branch of the

state government has violated its duty to uphold the constitution, and that by this act has attempted to impair the obligation of the contract. As said by Mr. Chief Justice SHARKEY in *Campbell* v. *Bank,* 6 How., 672: "We cannot treat lightly that which the legislature has solemnly determined to be politic and necessary, although it may have become odious." And as further held by Mr. Chief Justice PEYTON in *Newsom* v. *Cock,* 44 Miss., 361: "For it is a wise and salutary rule in regard to judicial construction of constitutional provisions, that in cases of doubt every possible presumption and intendment will be made in favor of the constitutionality of the act in question, and the courts will interfere only in cases of clear and unquestionable violation of the fundamental rules." And as said in Black on Constitutional Law: "The courts will not so construe the law as to make it in conflict with the constitution, but will rather put such an interpretation upon it as will avoid conflict with the constitution and give it the force of law, if it can be done without extravagance. They may disregard the natural and usual import of words used, if it be possible to adopt another constitution, sustaining the statute, which shall not be constrained or fantastic. In so doing, they construe the act in accordance with the presumed intention of the legislature. For the law-making body is always presumed to have acted within the scope of its powers."

Furthermore, the decision of this court upon the question is not that of a court of last resort, unless, perchance, it should declare that the act violated the federal constitution, in which case a writ of error would not lie to the supreme court, but the state would thereby be forever deprived of a portion of its sovereignty by reason of the decision of a court which *quo ad* the question was not the supreme authority.

The words of the federal constitution are: "No state shall pass any law impairing the obligation of a contract"; not the contract, not the value of the contract, not the rights arising under the contract. As defined in *Lessley* v. *Philips,* 49 Miss.,

801, by Justice SIMRALL: "The obligation of a contract is the duty of performance according to its terms." This is what the state is forbidden to impair. What term of this section has the state attempted to vary? State courts may compel the state by mandatory injunction to observe every right embraced within the section and by it granted, *Stone* v. *Railroad Co.,* 62 Miss., *supra;* the appellant is vouchsafed every right given under the contract and can in no wise complain. In *Ogden* v. *Saunders,* 12 Wheat, 317, it was held: "The learned chief justice, in delivering the opinion of the court in *Sturges* v. *Crowinshield,* after having defined the contract to be 'an agreement wherein the party undertakes to do or not to do, a particular thing' proceeds to define the obligation of the contract in these words: 'The law binds him to perform his engagement, and this is of course the obligation of the contract.' The institutes, Lib. 3, Tit. 4, Cooper's translation, say an obligation 'is a chain of the law by which we are necessarily bound to make some payment according to the law of the land.' Pothier in his treatise concerning obligations, in speaking of the obligation of contracts, calls it *vinculum legis,* the chain of the law. Paley, p. 56, says: To be obliged is to be urged by violent motives, resulting from the command of another.' From these authorities, and many more might be cited, it may be fairly concluded, that the obligation of the contract consists in the power and efficiency of the law, when applied to enforce the performance of the contract, or the payment of the equivalent for nonperformance. The obligation does not involve and subsist in the contract itself, *propiore vigore,* but is the law applicable to the contract. This is the sense I think in which the constitution uses the term obligation."

Again in *McCroken* v. *Haywood,* 2 How., 612, it is held: "The obligation of the contract consists in its binding force on the part of the maker. This depends on the law in existence when it was made; these are necessarily the measure of the obligation to perform them by the one party, and the right ac-

quired by the other. There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicates, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce its performance, by the remedies then in force." See also *Curran* v. *State,* 15 How., 319; *Walker* v. *Whitehead,* 16 Wall., 218; *Fitzgerald* v. *Railroad Co.,* 63 Vt., 172; *Bank* v. *Smith,* 7 Ohio St., 53.

The entire extent of the right covered by these two sections was to fix rates; the contract provided that this could be done; but the taxation of the franchise in no wise impaired its obligation. In granting it the power to tax was never relinquished by the state, unless the intention so to do is clear and explicit. The mere contract that the corporation may exercise a certain valuable franchise does not import an exemption from taxation. By such imposition the obligation is untouched, Were the rule otherwise the state could not impose the privilege tax on a corporation which it has chartered, unless the right so to do was expressly reserved in the charter. "Mere silence is the same as the denial of the exemption." *Adams* v. *Railroad Co.,* 77 Miss., 257, s.c., 24 South., 200. The constitution forbade any such grant of exemption from taxation, and the legislature surely could not by indirection accomplish that which it had been forbidden to directly, as held in the *Adams cases.*

Passing these insurmountable obstacles for the time, for argument's sake, we examined the cases where the legislature did have the power to exempt. The earlist case, *Bank* v. *Anthorp,* 12 Mass., 264, Mr. Chief Justice PARKER says, in speaking of a claim of immunity of a corporation, similar to that asserted here: "The object of this charter is to enable them in a body to conduct their business as an individual, to make contracts and to enforce them as such, avoiding the inconvenience of copartnership. It is all that is asked by the company;

and all that is given by the charter. It is a privilege to manage their business, and not an exemption from duty." Considered in its ultimate analysis, the claim of appellant, as to the impairment of the obligation of the contract by subsequent license taxation, amounts to the startling proposition that after the state has granted its charter authorizing the doing of a certain thing by a corporation where a valuable franchise or property right is created, that thereby by the action of the legislature the state itself, in its sovereign capacity, is forever barred to tax its franchises or property within its jurisdiction, as contrary to the constitutional mandate. The court has interpreted the constitution to mean that the property right under this mandate must be subject to taxation. The legislature under the constitution might create corporations with valuable special franchises, but neither in this, nor in any other way, could they do that which the constitution forbade, *i. e.*, create an exemption from taxation of any corporate property right, and especially, not by a charter to a special corporation. Any absolute contract for exemption from taxation of any corporation property, however it came into being, was contrary to the constitution and prohibited by it. And, moreover, the constitution was so framed that no irrepealable exemption could be granted; and, under the law, the exemption, if granted, was always subject to alteration and repeal. The claim that from under the charter right to do a thing there arose a contract for exemption from taxation by implication as to license taxes thereon, is thus conclusively settled.

Considered in its proper light, the claim of appellant, as to the impairment of the obligation of the contract by subsequent legislation, simply amounts to the claim that after the state has granted a charter to do a certain business, that, thereby the state forever estops itself from taxing that business carried on in pursuance of such charter, because it would impair the obligation of the contract. Such claim is unfounded in reason and

settled by the opinion of the great chief justice in *Bank* v. *Billings,* 4 Pet., 559, wherein he said:

"In November, 1791, the legislature of Rhode Island granted a charter of incorporation to certain individuals, who had associated themselves together for the purpose of forming a banking company. They are incorporated by the names of 'President, Directors and Company of the Providence Bank'; and have the ordinary powers which are supposed to be necessary for the usual objects of such associations.

"In 1792, the legislature of Rhode Island passed 'an act imposing a duty on licensed persons and others, and bodies corporate within the state' in which, among other things, it is enacted that there shall be paid for the use of the state, by each and every bank within the state, except the Bank of the United States, the sum of fifty cents on each and every thousand dollars of the capital stock actually paid in. This tax was afterwards augmented to one dollar and twenty-five cents.

"The Providence Bank, having determined to resist the payment of this tax, brought an action of trespass against the officers by whom a warrant of distress was issued against and served upon the property of the bank, in pursuance of the law. The defendants justify the taking set out in the declaration under the acts of assembly imposing the tax; to which plea the plaintiffs demur, and assign for cause of demurrer that the act is repugnant to the constitution of the United States, in as much as it impairs the obligation of the contract, created by their charter of incorporation. Judgment for defendants and appeal by plaintiffs.

"And it is not denied that a charter incorporating a bank is a contract. Is this contract impaired by taxing the banks of the state? This question is to be answered by the charter itself.

"It contains no stipulation promising exemption from taxation. The state, then, has made no express contract which has been impaired by the act of which the plaintiffs complain. No

words have been found in the charter, which, in themselves, would justify the opinion that the power of taxation was in the view of either of the parties, and that an assumption of it was intended, though not expressed.    The plaintiffs find great difficulty in showing that the charter contains a promise, either express or implied, not to tax the bank.    The elaborate and ingenious argument amounts to this.    The charter authorized the bank to employ its capital in banking transactions, for the benefit of the stockholders.    It binds the state to permit these transactions for this object and would come within the prohibition of the constitution.    But, as that cannot be done indirectly which may be done directly, the charter restrains the state from passing any act which may indirectly destroy the profits of the stock.    A power to tax the bank may unquestionably be carried to such an excess as to take all of its profits, and still more than its profits for the use of the state; and consequently destroy the institution.    Now, whatever may be the rule of expediency, the constitutionality of a measure depends, not on the degree of its exercise, but on its principle.    A power, therefore, which may in effect destroy the charter, is inconsistent with it; and is impliedly renounced by granting it.    Such a power cannot be exercised without impairing the obligation of the contract.    When pushed to its extreme point, or exercised in moderation, it is the same power, and is hostile to the rights granted by the charter.    This is substantially the argument for the bank.    The plaintiffs cite and rely on several sentiments expressed on various occasions by this court in support of these positions.

"The claim of the Providence Bank is certainly of first impression.    The power of taxing moneyed corporations has been frequently exercised; and has never before, so far as known, been resisted.    Its novelty, however, furnishes no conclusive argument against it.

"That the taxing power is of vital importance; that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm.    They are acknowledged and

asserted by all.   It would seem that the relinquishment of such a power is never to be assumed.   We will not say that a state may not relinquish it; that a consideration sufficiently valuable to evidence a partial release of it may not exist; but as the whole community is interested in retaining it unimpaired that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon does not appear.

"The plaintiffs would give to this charter the same construction as if it contained a clause exempting the bank from taxation on stock in trade.   But can it be supposed that such a clause would not enlarge its privileges?   They contend that it must be implied; because the power to tax may be so wielded as to defeat the purpose for which the charter was granted.   And may not this be said with equal truth of the legislative powers?   Does it not also apply with equal force to every incorporated company?   A company may be incorporated for the purpose of trading in goods as well as trading in money.   If the policy of the state should lead to the imposition of a tax on unincorporated companies, could those which might be incorporated claim an exemption in virtue of a charter which does not indicate such an intention?   The time may come when a duty may be imposed on manufactures.   Would an incorporated company be exempt from this duty, as the mere consequence of its charter?

"The great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men.   This capacity is always given to such a body.   Any privileges which may exempt it from burdens common to individuals, do not flow necessarily from the charter; but must be expressed in it, or they do not exist.

"If the power of taxation is inconsistent with the charter, because it may be so exercised as to destroy that for which the charter is given, it is equally inconsistent with every other charter, because it is equally capable of working the destruction

of the objects for which every other charter is given. If the grant of a power to trade in money to a given amount, implies an exemption of the stock in trade from taxation, because the tax may absorb all the profits, then the grant of any other thing implies the same exemption; for that thing may be taxed to an extent which will render it totally unprofitable to the grantee. Land, for example, has, in many, perhaps in all the states, been granted by government since the adoption of the constitution. This grant is a contract, the object of which is that the profits issuing from it shall inure to the benefit of the grantee. Yet the power of taxation may be carried so far as to absorb these profits. Does this impair the obligation of the contract? The idea is rejected by all; and the proposition appears so extravagant, that it is difficult to admit any resemblance in the cases. And, yet, if the proposition for which the plaintiffs contend be true, it carries us to this point. That proposition is, that a power which is in itself capable of being exerted to the total destruction of the grant, is inconsistent with the grant; and is therefore impliedly relinquished by the grantor though the language of the instrument contains no illusion to the subject.

"If this be an abstract truth, it may be supposed universal. But it is not universal; and therefore, its truth cannot be admitted, in these broad terms in any case. We must look for the exemption in the language of the instrument; and if we do not find it there, it would be going very far to insert it by construction.

"The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself, and need not be reserved when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of individuals may be it is still in the nature of that right, that it must bear a portion of the public burdens; and that portion

must be determined by the legislature. This vital power may be abused; but the constitution of the United States was not intended to permit the corrective for every abuse of power which may be committed by the state government. The interest, wisdom and justice of the representative body, and its relations with its constituents, furnish the only security where there is no express contract against unjust and excessive taxation as well as against unwise legislation generally."

Under these decisions, what, then, was the state forbidden by the constitution to impair? Not the contract, not the rights under the contract, but only the obligation of the contract. The obligation of the contract is inviolate and only the obligation—so much, but no more, and its obligation has been in no way impaired.

Soon after the charter was granted, March 11, 1884, the legislature passed the act creating the Railroad Commission and vesting in that body the supervision of rates.

In the case of *Gas Company* v. *County,* 109 U. S., the learned Justice MILLER said: "The section of the charter on which plaintiff's counsel mainly rely as showing a contract is the fifth section, which reads as follows: 'Sec. 5. The said company shall have the privilege of erecting, establishing and constructing gas works, and manufacturing and vending gas in the city of Nashville, by means of public works, for a term of fifty years from and after the date of this act. A reasonable price per thousand for gas shall be charged as in the southwestern cities; and for public lights, such sums as may be agreed upon by the company and the public authorities of Nashville; provided, said company shall never charge more than one cent for every cubic foot of gas used, as may be indicated by the gas meter, or computed by the ordinary rule in such cases; nor shall they ever charge the corporation of the City of Nashville more per cubic foot than they shall be getting at the said time from the majority of the inhabitants of the city using gas.'

"But the answer is that the company took their charter subject to the same rights of taxation in the state that applies to all other privileges and to all other property. If they wished or intended to have an exemption of any kind from taxation, or felt that it was necessary to the profitable working of the business, they should have required a provision to that effect in their charter. The constitution of the United States does not profess in all cases to protect property from unjust or oppressive taxation by the state."

This case was quoted at great length with approval in *Railroad Company* v. *New Orleans,* 143 U. S., 195, and the doctrine enunciated above unequivocally declared, and some remarks by way of argument in the prior case of *Gordon* v. *Appeal Tax Court,* 3 How., 133, construable contra, disproved, and overruled, and this case is the only one which we have been able to discover, after careful research, that ever attempted to lend color to appellant's contention.

In *Railroad Co.* v. *New York,* 199 U. S., the court said:—

"It is urged that when the public grants a privilege on condition of the payment of an annual sum the contract implies that the public shall exact no larger amount for that privilege, that to impose a tax is simply increasing the price which the grantee is called upon to pay for the privilege, and *Gordon* v. *Appeal Tax Court* 3 How., 133, 11 L. Ed., 529, is relied upon as authority. It is true, in the opinion of the court, announced by Mr. Justice WAYNE, in this language (p. 145 L. Ed. p. 535):

" 'Such a contract is a limitation upon the taxing power of the legislature making it, and upon succeeding legislatures, to impose any further tax upon the franchise. But, why, when bought, as it becomes property, may it not be taxed as land is taxed which has been brought from the state? was repeatedly asked in the course of the argument. The reason is, that everyone buys land, subject, in his own apprehension, to the great law of necessity, that we must contribute from it and all of our property something to maintain the state. But a franchise,

for banking, when bought, the price is paid for the use of the privilege whilst it lasts, and any tax upon it would substantially be an addition to the price.' "

"But there was in that case an express exemption from taxation in these words:—

" 'And be it enacted, that, upon any of the aforesaid banks accepting and complying with the terms and conditions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act.' "

"There being thus an express stipulation on the part of a state not to impose any further tax or burden, the question decided was really the extent of the exemption, and it was held to apply, not merely to the franchise, but to the property of the bank. The statements of Mr. Justice WAYNE were only by way of argument to support the conclusion that the exemption went beyond the franchise alone. Furthermore, that case has been repeatedly qualified and limited by subsequent decisions. In *New Orleans, etc., R. R. Co.* v. *New Orleans,* 143 U. S., 192, 36 L. Ed., 121, 12 Sup. Ct. Rep., 406, Mr. Justice GRAY, speaking for the court, said (p. 195, L. Ed., 122, Sup. Ct. Rep., p. 406):

"Exemption from taxation is never to be presumed. The legislature itself cannot be held to have intended to surrender the taxing power, unless its intention to do so has been declared in clear and unmistakable words. *Vicksburg, etc., R. Co.* v. *Dennis,* 116 U. S., 665, 29 L. Ed., 770, 6 Sup. Ct. Rep., 625, and cases cited. Assuming, without deciding, that the City of New Orleans was authorized to exempt the New Orleans City Railroad Company from taxation under general laws of the state, the contract between them affords no evidence of an intention to do so. The franchise to build and run a street railway was as much subject to taxation as any other property. In *Gordon* v. *Appeal Tax Court,* 3 How. (U. S.), 133, 11 L. Ed., 529, the only point decided was that an act of the

legislature continuing the charter of a bank, upon condition that the corporation should pay certain sums annually for public purposes, and declaring that, upon its accepting and complying with the provisions of the act, the faith of the state was pledged not to impose any further tax or burden upon the corporation during the continuance of the charter, exempted the stockholders from taxation on their stock; and so much of the opinion as might, taken by itself, seem to support this writ of error, has been often explained or disapproved. *Piqua Branch of State Bank* v. *Knoop,* 16 How., 369, 386, 401, 402, 14 L. Ed., 977, 984, 990, 991; *New York* v. *Tax & A. Com'rs,* 4 Wall., 244, 259, 18 L. Ed., 344, 350; *Jefferson Branch Bank* v. *Skelly,* 1 Black, 436, 446, 17 L. Ed., 173, 178; *Farrington* v. *Tennessee,* 95 U. S., 679, 690, 694; 24 L. Ed., 558, 561, 562; *Stone* v. *Farmer's Loan & Trust Company,* 116 U. S., 307, 328, 29 L. Ed. 636, 643, 6 Sup. Ct. Rep., 334, 388, 1191. The case at bar cannot be distinguished from that of *Memphis Gaslight Co.* v. *Taxing Dist.* in which this court upheld a license tax upon a corporation which had acquired by its charter the privilege of erecting gas works and making and selling gas for fifty years; and speaking by Mr. Justice MILLER, said:

"The argument of counsel is that if no express contract against taxation be found here it must be implied, because to permit the state to tax this company by a license tax for the privilege granted by its charter is to destroy that privilege. But the answer is that the company took their charter subject to the same right of taxation in the state that applies to all other privileges, and to all other property. If they wished or intended to have an exemption of any kind from taxation, or felt that it was necessary to the profitable working of their business, they should have required a provision to that effect in their charter. The constitution of the United States does not profess in all cases to protect property from unjust and oppressive taxation by the states. That is left to the state con-

stitutions and state laws.' 109 U. S., 398, 400, 27 L. Ed., 976, 977, 3 Sup. Ct. Rep., 205, 206."

*Murray* v. *Charleston,* 96 U. S., 439, is a case appellant relies greatly upon, but there is nothing therein contrary to our contentions, for precisely similar arguments were addressed to the supreme court of the United States in *Railway Co.* v. *New York,* 199 U. S., 42, where that court said:—

"*Murray* v. *Charleston,* 96 U. S., 423, is not in point. The City of Charleston, having issued bonds, subsequently passed an ordinance assessing a tax upon all real and personal property in the city, and directed the treasurer to retain out of the interest due on those bonds the amount of the tax. Murray was a resident of Germany, and resisted the reduction of interest, and it was held that the city could not, by way of a tax, reduce the amount of interest which it had promised to pay to this nonresident holder, the court saying in its opinion (p. 440 L. Ed. p. 671): 'A nonresident creditor cannot be said to be, in virtue of a debt due to him, a holder of property within the city, and the city council was authorized to make assessments only upon the inhabitants of Charleston or those holding taxable property within the same.' "

Furthermore, this case is excellent authority for appellee wherein considering (1) the holder of the "stick" (bonds) was a nonresident of Charleston, so that jurisdiction of both person and thing was wanting; (2) plaintiff could not be sued on the contract after the passage of the ordinance and recover the stipulated amount and that the reason thereof would have been that the obligation was altered by the ordinance in its terms.

Mr. Justice STRONG thus states the case:

"The plaintiff, a resident of Bonn, in Germany, was prior to the first day of January, 1870, and still is, the holder and owner of $25,262.35 of what is called stock of the city of Charleston. The stock is in reality a debt of the city, the evidence of which is certificates, whereby the city promises to pay to the owners thereof the sums of money therein mentioned

*together with six per cent interest payable quarterly.*    (Italics ours.)    One-third of the interest due on the first day of April, July and October, 1870, and January and July, 1871, having been retained by the city, this suit was brought to recover the sums so retained; and the answer to this complaint admitted the retention charged, but attempted to justify it under city ordinances, set out in full in answer to the complaint.    By these ordinances, set out in full in the answer, the city appraiser was directed to assess a tax of two cents upon the dollar of the value of all real and personal property in the city of Charleston, for the purpose of meeting the expenses of the city government; and the third section of each ordinance that the taxes assessed on city stock should be retained by the city treasurer out of the interest thereon, when the same is due and payable.    On these pleadings the case was submitted to the court for trial without jury and the court made a special finding of facts, substantially as set forth in the complaint and averred in the answer, upon which judgment was given for the defendant. The judgment was subsequently affirmed by the supreme court, and the record is now before us, brought here by writ of error."

It will be perceived that the city had promised to pay six per cent interest; that the stockholders could sue on this obligation, and the judgment would be on the obligation of the contract to pay six per cent interest.    But suppose the state could break this contract, embodied as to rates in sec. 19, could the plaintiff on the strength of this nineteenth section recover a judgment that the state could not levy a tax on this valuable part of the franchise.    We fear that there would be a variance between the contract and the proof, a contract as to rates, proof as to rates, no hint as to exemption that the judgment would go for the defendant.

Argued orally by *R. H. Thompson,* and *Edward Mayes,* for appellants, and by *Garner W. Green,* and *Marcellus Green,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

After the most careful and protracted consideration of this case, we have been driven to the conclusion that the $10 per mile additional privilege tax imposed by the act of 1898 (Laws 1898, p. 8, c. 5), which the reporter will set out in full, is in that respect unconstitutional as impairing the obligation of a contract, and as depriving the appellant of property without due process of law.    It was settled in the case of *Stone* v. *Y. & M. V. R. R. Co.*, 62 Miss., 643, 52 Am. Rep., 193, that that railroad had "the unquestionable right from time to time by its board of directors to fix the rates at which it would transport over its railroad, provided those rates should not exceed the maximum prescribed by its charter; that that provision was a contract; that on the faith of that contract capital was invested and the enterprise set on foot, and that it was not allowable for the legislature subsequent to the granting of the charter in 1882 to interfere with the exercise by the railroad of its plainly granted contract rights; that those rights were secure beyond the right of legislation, and could not be impaired." This decision was made construing the very section 6 of the charter of appellant now under consideration, and which section the reporter will set out in full.

There are several things to be noted which we think demonstrate the unconstitutionality of this act in this respect beyond controversy.    First. This additional privilege tax is an extraordinary tax, one over and beyond the usual privilege tax required to be paid by other railroads doing similar business in this state.    Second. It is clear that the imposition of this privilege tax is an exaction made solely because of the enjoyment by the appellant of this contract privilege in its charter.    It was not for the legislature to extend by the charter contract the privilege of regulating its rates within certain limits to this appellant with one hand, and then with the other, after the road had been built, practically take away the privilege by the imposition of this privilege tax.    Third. The appellant;

whilst it has the privilege of fixing its own rates, must do so within limits.   There is a maximum limit beyond which it cannot go, and there is no room, therefore, for the argument, if it were worth anything, that the railroad company might recoup itself against this additional privilege tax by raising its rates; for it is perfectly manifest that, if the legislature had the power to lay this additional privilege tax of $10 per mile, it had the power to lay an additional privilege tax of $1,000 per mile, and so it could very easily lay a privilege tax like this (whilst there is a maximum limit contained in the charter at least) so as to compel the company either to surrender its charter privilege or to actually lose money by continuing to enjoy and exercise it.   Fourth. This $10 per mile additional privilege tax is a burden imposed on the corporation as a condition to its further exercise of the corporate right conferred by its charter. There are few limitations, indeed, upon the right of the sovereign to exercise the taxing power, one essential to the existence of government; but it is just as certain that if something is denominated a tax, which is in essence not a tax, but a penalty, and which, in its operation, necessarily impairs the obligation of a contract, or deprives of property without due process of law, that something, whatever it may be called, and no matter by what legislation created, cannot stand the test made when its constitutionality is assailed.   We are clearly of the opinion that this legislation attempts to create a privilege tax, and not an *ad valorem* tax in any sense of the word.   Viewed as a privilege tax, we are constrained to declare that this legislation, in the particular respect indicated, violates both the contract clause of the constitution of the United States and the fourteenth amendment thereof.   If, however, the argument made with such exceeding ability and ingenuity, that this is to be treated as an *ad valorem* tax, could prevail, the result would be just as fatal to the appellee.   That argument is that this additional $10 per mile alleged privilege tax is constitutional and collectible, for the reason that no discrimination was thereby

created in privilege taxation, because the basis of the imposition of this privilege tax was this very immunity granted by the charter of the appellant, which immunity, it is urged, was itself an element of value in that it gave to the company power to increase its earnings, that it was itself, in other words, property which was subject to taxation, but, if this view is adopted, such taxation would most manifestly be taxation of property, as property, that is to say, *ad valorem* taxation. We have already held, in the course of this litigation, on demurrer, that the appellant would be liable, if liable at all, for this additional privilege tax, whether the railroad company had ever used or exercised the privilege granted by the charter or not. So that, whether the company availed itself of the privilege to regulate the rates or did not so avail itself, if this so-called privilege tax could be collected at all, its collectibility would not depend, in any sense, upon the fact whether or not the railroad company had availed itself of its said charter privilege. Now the legislature, in this act, has said itself as a matter of law that the existence in the charter, whether availed of or not, of this privilege, is, according to the argument of appellee's counsel, an element of value justifying the imposition of this tax expressly denominated an additional privilege tax. The commission was directed to classify railroads for privilege taxation, under this act, into first, second, and third class, according to gross earnings, and into narrow gauge according to the physical constitution of the road; but, that done, the Railroad Commission did all it was directed to do, except mere clerical work. The legislature itself then declared that this additional tax should be imposed upon each and every class of railroads, whether first, second, or third class, or narrow gauge, if only there was in the charter of such road this clause conferring the privilege of rate regulation within certain limits. In other words, it is perfectly clear that this so-called additional privilege tax is not imposed because of the gross earnings of the company, and not because of any capacity of the company to pay, but solely be-

cause of the existence of this privilege in its charter, and without reference to whether as a matter of fact this privilege did add anything of value to the property of the railroad or not. Necesasrily such a privilege tax so viewed would be discriminatory, since it is laid solely with reference to the mere existence of this charter right, and that, too, whether it be exercised or not, and whether it is of any financial value or not. It is inescapable that, so viewed, this so-called privilege tax is, in effect, a penalty imposed upon the appellant for the exercise of its contract right granted by its charter and confirmed by this court. But, once more, if we could consider this tax of $10 per mile as an *ad valorem* tax assessed upon the appellant on the theory that the existence of this charter right gives to the appellant an element of property, then manifestly a tax laid upon it as such—that is to say, as property—is an *ad valorem* tax, and not a privilege tax at all. In the revenue chapter, it is expressly provided that there shall be classification and assessment of railroad property for *ad valorem* taxation by the Railroad Commission, and that a valuation of such railroad property shall be made in the light of and with reference to the capacity of the company for gross earnings, both freight and passenger, and also in the light of and with reference to its franchise. If, therefore, this additional $10 per mile, so-called privilege tax, is to be defended on the ground that it is in the nature of a tax on a property value conferred by this privilege in the charter, then it was the duty of the Railroad Commission to consider this privilege as an element of property value in the valuation made by the Railroad Commission for *ad valorem* taxation under the general law; and it is reasonable to presume that the Railroad Commission discharged its duty in this respect as defined by the law, and, if so, then the very element of property value, which it is contended this charter privilege gives the appellant company, must have been taken into consideration by the Commission in fixing the *ad valorem* taxation. Whether, therefore,

this additional $10 per mile is to be treated as a privilege tax or as an *ad valorem* tax, in either case the appellee must fail in its suit.

*Wherefore the judgment is reversed and the suit dismissed.*